Filed 12/8/15  In re R.S. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re R.S., a Person Coming Under the Juvenile Court Law. | B265471 (Los Angeles County Super. Ct. No. DK01956) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> CAROLINA M., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Julie F. Blackshaw, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

———————————————————

Carolina M. (mother) appeals from the dependency court's July 14, 2015 order terminating her parental rights under Welfare and Institutions Code section 366.26[1] and selecting adoption as the permanent plan for her son, R.S. Mother contends the trial court erred when it found no statutory exception applied to prevent termination of her parental rights. We affirm.

## FACTS AND PROCEDURAL HISTORY

When mother gave birth to R.S. in October 2013, both mother and baby tested positive for amphetamines. The Los Angeles County Department of Children and Family Services (Department) opened an investigation. Mother admitted to using "Molly" amphetamines during her pregnancy, but was willing to do whatever it took to get her baby back. Mother identified Sergio S. (father)[2] as R.S.'s father, but his whereabouts were unknown. Upon discharge from the hospital, R.S. was placed in maternal grandparents' custody. The court ordered mother into a drug treatment program, with random testing. Mother had monitored visitation, two hours per visit, three times a week.

Mother enrolled in a residential substance abuse treatment program in November 2013, and informed the social worker she expected to complete the program by December 20, 2013. She admitted that beginning about two years earlier, she had been using speed (street vernacular for powerful stimulants, typically associated with amphetamine or methamphetamine) on a regular basis, and had used "Molly" two or three times a week while pregnant. Maternal grandmother stated that the alleged father physically assaulted mother on a regular basis, and mother was covered in bruises when she gave birth to R.S. However, mother denied being a victim of domestic violence. Mother did not contact the Department when her residential drug treatment program

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise stated.

[2] Father did not appear before the dependency court and does not appeal.

2

ended, and relatives could not provide contact information for mother. The Department became concerned that mother might be visiting R.S. while under the influence. The social worker told maternal grandmother on January 8, 2014, that future visits would need to take place at the Department offices. On January 13, 2014, mother and the alleged father showed up at maternal grandmother's home, threatening her and demanding she turn R.S. over to them. Maternal great aunt notified the social worker immediately, and the police were called.

On January 14, 2014, the dependency court sustained the Department's petition, finding R.S. to be a minor described by section 300, subdivision (b), based on mother's history of substance abuse and R.S.'s positive toxicology tests at birth. The court continued monitored visitation for mother, and ordered family reunification services, including a substance abuse program, drug testing, a 12-step program, and a psychological assessment.

A progress report dated April 15, 2014, stated that mother had not yet enrolled in a residential drug treatment program. She first falsely claimed the program had a waiting list, then missed a number of scheduled intake appointments. On April 1, 2014, the program conducted an intake assessment and was ready to admit mother, but she did not want to stay that day and said she would return the following day. Mother did not return the next day as promised. Mother also claimed to be attending a 12-step program, but could not provide the social worker with any proof of attendance. Four drug tests during the time period were negative, but mother missed one test in February. Despite her difficulties in complying with the court-ordered reunification services, mother consistently attended monitored visits with R.S. The Department reported mother's visits with R.S. were appropriate, and she would hold and kiss him during the two-hour visits.

The Department's July 15, 2014 six-month status review report noted that although mother's efforts started strong when she enrolled in an in-patient facility in November 2013, her progress had faded and she had not addressed her mental health or substance abuse issues. She was admitted to a substance abuse program twice, but failed to attend her required sessions. Out of seven drug tests between March 31 and July 9,

3

2014, four had negative results, and three were missed. Mother's monitored visitation with R.S. remained consistent, and monitoring was done by the maternal grandfather, rather than the social worker. The social worker had trouble contacting mother to arrange follow-up because mother did not have a cell phone. R.S. seemed attached to maternal grandparents, who were taking exceptional care of him. Maternal grandparents continued to express concern about mother suffering from acts of violence, because there were visible bruises on mother's face and body. Maternal grandparents suspected mother was living with the alleged father. The social worker was only able to speak to the alleged father twice, and he denied paternity and asked the social worker how to request DNA testing to establish he is not R.S.'s father.

On October 14, 2014, the Department reported that mother still had not participated in a drug or alcohol treatment program, a 12-step program, or mental health counseling to address case issues. She missed three of five drug tests and was currently living with the alleged father. The Department recommended that the court terminate reunification services to mother and set a date for a permanency planning hearing under section 366.26.

At the six-month hearing in October 2014,[3] the court found that mother had not made significant progress in resolving the problems that led to R.S.'s removal, nor had she demonstrated a capacity or ability to complete the objectives of her case plan. The court terminated mother's reunification services and scheduled a permanency planning hearing under section 366.26.

In an April 2015 progress report, the Department reported that mother continued to have regular monitored visitation with R.S., but missed six out of seven drug tests.

The court held a permanency planning hearing under section 366.26 on July 14,

---

[3] The six month hearing under section 366.21, subdivision (e) was originally scheduled for July 15, 2014, but was continued to October 14, 2014, to permit mother to contest.

4

2015.[4]  On the day of the hearing, mother filed a section 388 petition, asking the court to reinstate reunification services.  The petition explained that starting May 20, 2015, mother had been participating in a drug treatment program three times a week, tested negative for drugs four times, attended 12-step meetings, and completed a mental health assessment.

After an offer of proof from mother's counsel, the court permitted mother to testify on the issue of whether the parental relationship exception under section 366.26, subdivision (c)(1)(B)(i) applied.  Mother testified that she and R.S. were really close, "so close that when my mom and I were together, he prefers to be with me than with her."  During visits, she reads to him, sings to him, and teaches him basic words.  He cries when he knows the visits are about to finish.  She believes R.S. would be hurt if he did not have any contact with her, because even after a two hour visit, her mother says he will cry for four hours.  She talks to him on the phone every day.  At the end of her testimony, mother asked the court to give her just one more chance.

Mother's counsel asked the court to consider that mother was in the process of doing what was needed to be able to reunify with R.S., including maintaining consistent visitation.  Counsel pointed out that once the adoption was finalized, there would be no guarantee that mother could continue to visit.  Counsel instead asked for the court to order legal guardianship, to allow security for the child while also leaving open for mother the chance of regaining custody if she qualified.  Attorneys for R.S. and the Department pointed out that mother could not offer the stability comparable to adoption by maternal grandparents, and urged the court to terminate mother's parental rights.  The court terminated mother's parental rights after finding that mother did not meet her burden of demonstrating that the exception under section 366.26, subdivision (c)(1)(B)(i) was applicable.  It also denied mother's section 388 petition.

_____

[4] The court continued the permanency planning hearing from February 9, 2015 to July 14, 2015 to allow the Department to provide notice to the alleged father and to complete an adoption home study for R.S.'s maternal grandparents.

## DISCUSSION

Mother contends the dependency court erred when it found inapplicable the parental relationship exception under section 366.26, subdivision (c)(1)(B)(i), and seeks reversal of the order terminating her parental rights. We find no error.

We assess whether the court's order on the parental relationship exception is supported by substantial evidence.[5] (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166.) If supported by substantial evidence, the finding here must be upheld, even though substantial evidence may also exist that would support a contrary result and the dependency court might have reached a different conclusion had it determined the facts and weighed credibility differently. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.]" (*In re Matthew S.* (1988) 201 Cal.App.3d 315, 321.)

Under section 366.26, subdivision (c)(1)(B)(i), if the dependency court terminates reunification services and finds the child is adoptable, it must terminate parental rights unless it "finds a compelling reason for determining that termination would be detrimental to the child due to [the circumstance that the parent has] [¶] . . . maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The parental relationship exception "does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the

---

[5] "[S]ome courts have applied different standards of review. (*In re K.P.* [(2012)] 203 Cal.App.4th [614,] 621-622 [question of whether beneficial parental relationship exists is reviewed for substantial evidence, whereas question of whether relationship provides compelling reason for applying exception is reviewed for abuse of discretion]; *In re C.B.* (2010) 190 Cal.App.4th 102, 122-123 [abuse-of-discretion standard governs review, but 'pure' factual findings reviewed for substantial evidence]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [applying abuse of discretion standard].) On the record before us, we would affirm under either of these standards. (E.g., [*In re*] *Jasmine D.*, [*supra*,] at p. 1351 [practical differences between substantial evidence and abuse of discretion standards are minor].)" (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1166, fn. 7.)

child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.) "A parent must show more than frequent and loving contact or pleasant visits. [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child . . . .' [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.26, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated. [Citation.]" (*In re C.F.* (2011) 193 Cal.App.4th 549, 555, fn. omitted.) "The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

Mother's relationship with R.S. did not promote R.S.'s well-being "'to such a degree as to outweigh the well-being the child would gain in a permanent home . . . .'" (*In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1534; accord, *In re Jasmine D.*, *supra*, 78 Cal.App.4th at pp. 1347-1350.) R.S.'s maternal grandparents have been consistent caregivers since R.S. was discharged from the hospital as a newborn. He is now two years old, and while R.S. may have a close relationship with his mother because she visits him three times a week for two-hour monitored visits, that alone does not suffice to establish that R.S. would suffer detriment if the relationship was ended, or that the court erred in finding that there was no evidence of detriment.

Mother argues that the exception under section 366.26, subdivision (c)(1)(B)(i), is applicable even though she is not R.S.'s primary caretaker. She points to *In re S.B.* (2008) 164 Cal.App.4th 289, where the court found the exception applicable because the child derived benefit from a continuing relationship with her father, even though father did not fulfill a parental role. The same court in a later case limited *In re S.B.* to its extraordinary facts, that the father had developed a close bond with his daughter by being her primary caretaker for three years, and immediately started services and maintained

sobriety after the dependency court removed the child from his custody.  (*In re C.F.* (2011) 193 Cal.App.4th 549, 558.)  Mother here is more like the mother in *In re C.F.*, in that she has been unable to maintain compliance with reunification services, and is belatedly asking for the court to give her one last chance.  Mother has not provided a bonding study or any other evidence of why the prospect of a continued relationship with mother would outweigh the benefits of permanency.  (*Id.* at pp. 557-558.)

We recognize that the court's action terminating mother's parental rights will mean maternal grandparents will have the legal right to restrict or even end mother's visits.  (See *In re S.B.*, *supra*, 164 Cal.App.4th at p. 300 ["[w]e do not believe a parent should be deprived of a legal relationship with his or her child on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents"].)  However, we do not second-guess the dependency court's determination that the benefit of permanency outweighs any possible benefit of legally preserving the relationship between R.S. and mother.  The court's determination the parental relationship exception does not apply in this case is supported by substantial evidence.

## DISPOSITION

The order terminating mother's parental rights is affirmed.


KRIEGLER, J.


We concur:



TURNER, P. J.                                        BAKER, J.


8